IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MARY K. VANDIVER                                                         PLAINTIFF

            v.                              Civil No. 04-2278

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                          DEFENDANT

## MEMORANDUM OPINION

Plaintiff Mary K. Vandiver brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration denying

her application for disability insurance benefits (DIB) under the provisions of Title II of the

Social Security Act and her application for supplemental security income (SSI) under the

provisions of Title XVI.

## Procedural Background:

Vandiver protectively filed her applications for DIB and SSI on August 7, 1996. (Tr. 13,

71, 72-75, 179-185). She alleged a disability onset date of December 16, 1993, due to a variety

of complaints including pain in her lower back, hips, and legs and arthritis. (Tr. 13, 80, 72-75,

107-110).

An administrative hearing was held on September 3, 1997. (Tr. 32-54). Vandiver

testified and was  represented by counsel. (Tr. 34-53). By written decision dated January 30,

1998, the administrative law judge (ALJ) found that Vandiver was not disabled within the

meaning of the Act. (Tr. 14-25). Vandiver requested review by the Appeals Council and her

request was denied on August 26, 1999. (Tr. 3, 8, 65). Vandiver then brought a civil action

-1-

seeking review of the Commissioner's decision, *Vandiver v. Apfel*, Civil No. 99-2184. (Tr. 196-203). On August 18, 2000, the case was remanded to the Commissioner. (Tr. 196). The Appeals Council sent the case back to the ALJ. (Tr. 204).

Following remand, a second hearing was held on February 21, 2001. (Tr. 218-249). Vandiver, who was represented by counsel, appeared and testified. (Tr. 221-249). Jack Hudson, a friend of Vandiver's, testified. (Tr. 249-254). A vocational expert, Clyde Petete, also testified. (Tr. 254-265).

The ALJ noted that Vandiver's alleged disability onset date was December 16, 1993, and her date last insured was March 31, 1994. (Tr. 180, 220). On March 22, 2001, the ALJ issued an unfavorable decision. (Tr. 176-187).

The ALJ concluded that although severe Vandiver's impairments did not meet or equal the criteria of any of the impairments listed in Appendix I, Subpart P, Regulations No. 4 (Tr. 181). After discrediting Vandiver's subjective allegations, the ALJ concluded that she maintained the residual functional capacity (RFC) to engage in a significant range of light work with no repetitive bending, lifting, or twisting, with her being able to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, and to stand and/or walk for up to six hours in an eight hour day. (Tr. 184-185).

Due to the exertional levels of her past work, the ALJ concluded she was unable to perform her past relevant work. (Tr. 184). Relying on the testimony of a vocational expert, the ALJ concluded there were jobs in the local, state, and national economy that Vandiver could perform including an attendant, a cashier, and a video rental clerk. (Tr. 185). Vandiver requested review of the decision. (Tr. 174).

-2-

**Evidence Presented:**

At the hearing held on September 3, 1997, Vandiver was thirty-eight years old. (Tr. 45). She has a high school education. (Tr. 49). At the time, she lived with her husband and two minor children. (Tr. 34). She has three of her own children and one stepson. (Tr. 53). Her husband has lower back problems and is disabled. (Tr. 52-53).

In 1989 and 1990, she had some problems with her cervical spine, shoulder, wrist, and neck. (Tr. 35-36). She was treated by Dr. Peter Irwin in the Orthopedic Department of the Oakcroft Clinic. (Tr. 36).

She never completely recovered from these problems. (Tr. 36). Her right wrist hurts when she does repetitive motions and she still has pain in her neck and shoulder. (Tr. 36). She was told she had a permanent injury to her neck and wrist. (Tr. 37). She had some depression in 1990 regarding the neck and wrist injury. (Tr. 37). Despite these injuries, she was able to return to work for a period of time. (Tr. 37).

Vandiver testified she worked in the plastics department of a toy manufacturing company, as a jailer and dispatcher, at a company that manufactured combs and brushes, and on a production line in a chicken plant. (Tr. 39-42). She testified she was last employed at Taco Rio as a food preparation worker. (Tr. 35). In this position she carried food in large containers, engaged in repetitive bending, stooping, and twisting, and was on her feet most of the day. (Tr. 38-39). On December 19, 1993, when she stretched to reach into a cabinet well above her head she twisted in a manner that caused severe pain in her lower back. (Tr. 35).

She was treated at the Booneville Community hospital on December 20 and December 28, 1993. (Tr. 35). She was then under the care of Dr. Cheyne at the Orthopedic Department

-3-

of Oakcroft Clinic. (Tr. 35). After several months, Dr. Cheyne released her from his care and put permanent restrictions on her. (Tr. 37). Specifically, he put a twenty (20) pound weight restriction on her and no repetitive bending, lifting, or twisting. (Tr. 38). With these restrictions, she could not return to her job at Taco Rio. (Tr. 38).

Vandiver testified that she could perform none of the jobs she had previously done with the restrictions placed on her by Dr. Cheyne. (Tr. 42). She attempted to work at Eddie's Drive-in following her back injury but the job duties violated the restrictions Dr. Cheyne put on her and she was only able to work for approximately two months. (Tr. 43). She had severe wrist pain, her shoulder bothered her, and her back continued to get worse. (Tr. 44).

She then found work at Tyson Foods. (Tr. 44). Although she felt like she would not be able to do the job, Vandiver testified she was financially strapped and felt like she had to try to work again. (Tr. 44). She was in a lot of pain and made it about a month before she was not able to get up and go on with the job. (Tr. 45).

In 1996, she was referred to Dr. Linnington at the Pain Clinic for epidural steroid injections in her lower back. (Tr. 45). The injections made her back worse. (Tr. 45). Dr. Daniel is her family doctor. (Tr. 46).

When asked to describe the physical problems that were causing her not to be able to work, Vandiver responded that she had constant lower back pain that radiates down her right leg all the way to her toes. (Tr. 46). She also indicated she had pain in her joints. (Tr. 46). She testified that the pain in her wrist was to the point that she could hardly write. (Tr. 46). She stated she could not stand up to manual labor. (Tr. 46).

AO72A
(Rev. 8/82)

Vandiver testified it is very difficult for her to ride in a vehicle. (Tr. 49). Since the closest vocational technical school or college is at least forty miles from her home, she testified she doesn't have any plans to go back to school. (Tr. 49).

Vandiver testified her condition was much worse than it was when Dr. Cheyne placed restrictions on her in August of 1994. (Tr. 46). Specifically, she indicated she was in much more pain than she was then. (Tr. 46).

On an typical day, Vandiver testified she got up around 7:00 a.m. to see her children off to school and occasionally fixes them breakfast. (Tr. 47). She usually is up thirty to forty minutes before she takes pain medication. (Tr. 47). Vandiver indicates she tries to go as long as she can without taking it. (Tr. 47). She stated she can get more relief if she spreads out the pain medication. (Tr. 47). She had been taking more medication but her doctor talked to her about the medication being a long term prescribed medication and he suggested she take one every eight hours. (Tr. 47). She takes Lorcet twice a day. (Tr. 48). She also takes Aleve and Advil at night sometimes. (Tr. 47).

After she takes the pain medication, she attempts to do the dishes and maybe starts a load of laundry, tries to straighten up the living room, and sweeps the kitchen floor. (Tr. 48). If it is a good day, she can get through some of these activities before she has to lay down. (Tr. 48). She lays down three or four times a day for about an hour or more at a time. (Tr. 48).

Vandiver testified she wakes up at least twice a night because of her pain. (Tr. 49). When she wakes up in the morning, she feels tired and drug out like she didn't get any sleep. (Tr. 49).

AO72A
(Rev. 8/82)

Vandiver indicates she has been told that she needs a hysterectomy but simply does not have the money for the surgery. (Tr. 49-50). She has also suffered panic attacks or anxiety since she was seventeen. (Tr. 51). She has been treated by Dr. Daniel. When she worked for the police department in 1984 she was hospitalized by Dr. John Williams for seven days based on stress, anxiety and exhaustion. (Tr. 51-52).

The second hearing was held on February 21, 2001.[1] (Tr. 216-266). At the time of the hearing, Vandiver was forty-two years old. (Tr. 222).

Vandiver testified the last time she worked for pay was in 1995 when she worked for Tyson's for less than thirty days. (Tr. 222). She worked on a processing line in a poultry plant. (Tr. 223). She had to leave this job because of problems with her back and her right hand. (Tr. 223).

Vandiver testified that when she was young she had broken the fingers on her right hand and injured her wrist. (Tr. 223). Then, in 1989 while she was working at a toy factory, Vandiver testified she sustained injuries to the same hand and wrist. (Tr. 223). Specifically, she testified she was trying to remove a plastic component that was stuck into the mold of the machine, pulling on it, and she tore the ligaments and tendons in her wrist. (Tr. 224). She was off work for awhile, then given some light-duty work for a couple of weeks, and then told she should consider herself laid-off. (Tr. 224).

Vandiver also described the back injury she sustained while working at Taco Rio. (Tr. 226-228). Following this injury, Vandiver testified severe back pain kept her from working. (Tr.

---

[1] The first page of the hearing transcript indicates the date of the hearing was February 21, 2005. (Tr. 216). However, this appears to be a typographical error. *See* (Tr. 207–notice of hearing scheduled for February 21, 2001; Tr. 266–last page of hearing transcript containing the date February 21, 2001).

-6-

234). She also stated she was having some problems with her neck and right shoulder. (Tr. 234). However, mostly it was back pain and pain in her legs that kept her from working. (Tr. 234). She indicated the pain started mostly in her right leg but within a few months it was in both legs. (Tr. 234). Vandiver testified her pain was worse today than in was in 1994. (Tr. 235).

Vandiver testified that between 1994 and 1996 she basically had no medical treatment because she had no insurance and no money. (Tr. 240). However, she indicated she continued to have severe back pain, leg pain, right wrist pain, and neck and shoulder pain. (Tr. 241). In 1996, her family doctor, Dr. Daniel, indicated he would do what he could for her even though she had no money. (Tr. 240).

In the Fall of 1996, Vandiver indicated she underwent a series of three epidural steroid injections. (Tr. 242). She believed something went wrong during the third injection, she testified that she could feel nothing put pain, heaviness, and numbness in her legs. (Tr. 242-243). She indicated she could not stand upright for about eight weeks. (Tr. 243).

After her injury and while she was at Taco Rio, Vandiver testified she could only stand on her feet for a few minutes at a time. (Tr. 247). If she stood on her feet very long, the pain was unbearable. (Tr. 247). She also had trouble lifting. (Tr. 248).

Although Dr. Cheyne released her to return to work and stated she could lift twenty-five pounds, Vandiver testified she absolutely could not lift that much weight. (Tr. 248). She indicated she is still having problems sitting and standing. (Tr. 248). If she sits more than ten to fifteen minutes, she is in pain. (Tr. 249). The pain interferes with her concentration. (Tr. 249).

-7-

Jack Hudson, a friend, testified he has known Vandiver since 1974. (Tr. 250). He indicated her testimony accurately described the problems that she was having. (Tr. 250). He recalled his problems started December 16, 1993, when she was working at Taco Rio. (Tr. 252).

Hudson testified there were times Vandiver could not get out of bed sometimes for a couple of weeks running except to go to the bathroom. (Tr. 251). Hudson testified Vandiver has been in a lot of pain and frequently had to lay down during the day. (Tr. 251-252). He knew she was going to doctors and taking medications but still having problems. (Tr. 252). There were times when she was doing better and wouldn't mention any pain for a couple of weeks and then she would have moderate to extreme pain for periods of time. (Tr. 253).

Clyde Petete, a vocational expert, was called to testify. (Tr. 254). Petete testified Vandiver's past jobs had been unskilled medium or heavy work. (Tr. 256-257). He indicated she had no transferrable skills. (Tr. 257).

Petete was then asked to consider a series of hypothetical questions concerning a person the same age, education, and vocational profile as Vandiver. (Tr. 257). In the first hypothetical, the claimant was limited to a twenty-pound weight restriction, lifting and carrying twenty pounds maximum occasionally and ten pound frequently. (Tr. 258). The claimant would have the ability to stand and walk for six out of eight hours in a workday and be able to sit for six out of eight hours in a workday. (Tr. 258). The claimant could have no repetitive bending, lifting, or twisting. (Tr. 258).

Petete indicated this claimant would not be able to perform any of Vandiver's past relevant work. (Tr. 258). However, Petete indicate there were other jobs in the national

-8-

economy such a person could perform including a service establishment attendant, cashier II, and video rental clerk. (Tr. 258-260).

In the second hypothetical, the claimant was limited to lifting and carrying ten pounds occasionally and less than that frequently, with standing and walking for only two out of an eight hour day, and sitting for six hours in an eight hour day with a sit stand option. (Tr. 260). The claimant would also be precluded from engaging in repetitive bending, lifting, and twisting. (Tr. 260).

Petete indicate there were jobs in the national economy this person could perform. (Tr. 261). Such jobs include reception information clerk, telemarketer, and security monitor. (Tr. 262).

In the third hypothetical, Petete was asked to assume the claimant could not lift at least ten pounds and could not stand and walk for even two hours in an eight hour day because of pain. (Tr. 262-263). Petete indicated these limitations would eliminate all jobs. (Tr. 263).

Petete was then asked whether all of the jobs he described would be eliminated if you added the problem that the claimant's pain affects her ability to concentrate and work at a steady pace. (Tr. 263). Petete testified that if the claimant were in the degree of pain testified to by Vandiver it would eliminate all jobs he identified. (Tr. 263).

The record contains the following medical and vocational evidence. In August of 1988 Vandiver was treated for anxiety and depression. (Tr. 138-139). She was also treated for abdominal pain and cramping related to her menstrual cycle. (Tr. 139).

On August 2, 1989, when Vandiver was working at a plastics manufacturing company and pulling components of plastic toys from molds she noticed a snapping in her wrist followed

-9-

by persistent and severe discomfort and pain in the hand and wrist. (Tr. 137). She was seen by Dr. John R. Williams and prescribed Butazolidin. (Tr. 137). She was told not to do any heavy weight lighting with her hand. (Tr. 137). She was placed on light duty work for a week. (Tr. 137).

On August 14, 1989, Dr. Williams noted that Vandiver was still quite tender over the volar aspect of the wrist. (Tr. 137). He stated she had very little difficulty moving the wrist and there was no significant limitation of motion. (Tr. 137). He opined that this appeared to represent early carpal tunnel syndrome. (Tr. 137).

In late 1989 and the first half of 1990, Vandiver was seen by Dr. Peter Irwin. (Tr. 148-155). Vandiver complained of muscle spasms in her neck and constant pain in her right shoulder and wrist. (Tr. 149). The symptoms in the right shoulder did not present themselves until September 11, 1989. (Tr. 150). X-rays of the cervical vertebrae demonstrated mild scoliosis and no other abnormalities. (Tr. 153). X-rays of her right shoulder showed no bony abnormalities. (Tr. 153).

Her arthritis screen was essentially negative. (Tr. 154). Vandiver underwent physical therapy to measure her range of motion and strength. (Tr. 154). Vandiver demonstrated difficulty with manual dexterity but her range of motion was essentially full in the wrist and strength was within normal range for pinch, 3 point prehension and Jamar grip strength. (Tr. 154). Dr. Irwin concluded that in view of Vandiver's symptoms and her manual dexterity she had a residual degree of permanent physical impairment amounting to 15% of the upper extremity. (Tr. 154).

-10-

On physical examination of Vandiver's hand, Dr. Irwin noted that he could detect no significant abnormalities. (Tr. 149). Vandiver had good grip and no muscle weakness in the upper extremities. (Tr. 149). Superficial and deep tendon reflexes were equal and physiological as tested bilaterally. (Tr. 149). No pathological reflexes were elicited. (Tr. 149).

Dr. Irwin noted that Vandiver was also having some depression. (Tr. 149). On May 3, 1990, Dr. Irwin stated that the 15% impairment rating assessed to the extremity which did not include the problem with the shoulder. (Tr. 150). He indicated Vandiver had chronic pain which was related to the August 2, 1989, accident. (Tr. 150).

Dr. Irwin noted Vandiver had restricted use of her right upper extremity because of pain and had a residual degree of permanent physical impairment of 3% of the body as a whole. (Tr. 148). Dr. Irwin noted this impairment rating was because the neck and shoulder were also involved. (Tr. 148).

On July 10, 1990, Vandiver was evaluated by D. James Booth, L.C.S.W., for assistance with pain control and related depression. (Tr. 145). Vandiver reported having anxiety attacks since she was about seventeen years old. (Tr. 146). The attacks had been well controlled during her adult life with her only having a few attacks. (Tr. 146). She described her right wrist as being quite painful and also reported periodic spasms in her neck and wrist. (Tr. 145). Vandiver was noted to be moderately depressed. (Tr. 146). Booth recommended psychotherapy to assist Vandiver in resolving some of the past life issues as well as hypnotherapy to reduce tension in her injured extremity. (Tr. 147).

On December 20, 1993, Vandiver was seen at the Booneville Community Hospital. (Tr. 158-159). She was put on bed rest, prescribed pain medication, and given a note to be off work

for eight days. (Tr. 159). She was seen for a follow-up on December 28th and a spinal x-ray ordered. (Tr. 158).

On January 5, 1994, Vandiver was seen by Dr. Tom Cheyne. (Tr. 127). She complained of right lower back pain and right leg pain. (Tr. 127). She stated this began when she was twisting to reach for something. (Tr. 127). On physical examination, Dr. Cheyne noted she was tender in the right lower back. (Tr. 127). She could bend and touch her mid lower legs, walk on her toes and heels without difficulty, had normal sensory and motor function in the lower extremities, and her DTRs were 1+ and equal bilaterally. (Tr. 127). Her straight leg raise was negative bilaterally. (Tr. 127). X-rays of the lumbar spine were within normal limits. (Tr. 127). Dr. Cheyne's diagnosis was acute lumbar strain. (Tr. 127).

On January 12, 1994, Dr. Cheyne noted that Vandiver's CT scan had shown a circumferential annular bulge at L4-5 with a prominence to the left which extended into the left neuroforamen. (Tr. 125 & 130). Vandiver continued to complain of right leg symptoms but indicated she had left leg symptoms on and off. (Tr. 125). Vandiver was prescribed Lorcet Plus. (Tr. 125).

On February 15, 1994, Vandiver was seen by Dr. Cheyne. (Tr. 124). He noted that she continued to complain of low back and right leg pain. (Tr. 124). Dr. Cheyne referred Vandiver to Dr. Landherr to see if she was a surgical candidate. (Tr. 124). On March 15, 1994, Dr. Landherr determined that Vandiver was not a candidate for neuro-surgery. (Tr. 122).

On April 14, 1994, Vandiver was seen by Dr. Cheyne. (Tr. 121). He noted her MRI scan was completely normal. (Tr. 121 & 132). He released her to return to work with a twenty-five (25) pound weight restriction. (Tr. 121).

-12-

On August 8, 1994, Vandiver was seen by Dr. Cheyne. (Tr. 120). She reported having a flare up with her back. (Tr. 120). Dr. Cheyne recommended that they treat the back more aggressively but Vandiver was still dealing with an attorney and indicated he had not had time to take care of her situation at that point. (Tr. 120). She was continued on Flexeril, put on Naprosyn, and given a few Lorcet HD for pain. (Tr. 120). She was also to go to physical therapy daily. (Tr. 120).

On August 15, 1994, Vandiver was seen by Dr. Cheyne. (Tr. 119). She was doing better on Naprosyn. (Tr. 119). In his opinion, she had a 3% permanent impairment of the body as a whole related to her lumbar disc protrusion. (Tr. 119). Dr. Cheyne released Vandiver with a permanent twenty (20) pound weight restriction and no repetitive bending, lifting, or twisting. (Tr. 119). Dr. Cheyne did not intend to see Vandiver again unless she had further problems. (Tr. 119). He continued her Naprosyn for a couple of weeks. (Tr. 119).

On July 1, 1996, Vandiver was seen by Dr. W.R. Daniel. (Tr. 136). She reported she had been hoeing in the garden last Tuesday for about thirty-five minutes and had severe low back pain with right leg radicular. (Tr. 136). He noted she had previous problems of the same type in December of 1993. (Tr. 136). She settled with worker's compensation with a 3% rating to her body as a whole. (Tr. 136). She also reported having a 20% rating on her right hand due to an old right wrist injury. (Tr. 136).

Dr. Daniel noted Vandiver had significant pain with the straight leg raise until about 80 degrees. (Tr. 136). She had no significant hypesthesias in her right leg except possibly in the right thigh area. (Tr. 136). She had normal reflexes at both knees and ankles. (Tr. 136). She was scheduled for an MRI on July 3, 1996. (Tr. 136).

-13-

On August 27, 1996, Vandiver filled out a disability supplemental interview outline. (Tr. 88-92. She listed her weight as 150 and height as 5'4". (Tr. 88). She indicated she had completed high school. (Tr. 91).

She indicated she was not able to bathe, dress, or take care of her own hair care needs. (Tr. 88). She indicated at times she has to have assistance to complete these tasks. (Tr. 88). She indicated she could not do laundry, dishes, change sheets, iron, vacuum/sweep, take out the trash, do home repairs, repair appliances, wash the car, mow the law, rake leaves, or do garden work. (Tr. 88). She stated these tasks were very difficult for her because of the lifting and bending involved. (Tr. 88). She indicated there were some days when she could do small amounts of them. (Tr. 88).

She stated she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 88). However, she stated there are some days she cannot do errands. (Tr. 88).

She stated she prepared meals twice a week including sandwiches, frozen dinners, meats, vegetables, desserts, homemade bread, and dishes that requires a recipe. (Tr. 89). She indicated it takes her about twenty minutes to prepare a meal. (Tr. 89). She indicated it took her longer since her disability began. (Tr. 89).

She indicated she could pay bills, use a check book, and count change. (Tr. 89). She stated she could not drive or walk for exercise. (Tr. 89). However, she indicated there were times when she could drive short distances. (Tr. 89). Additionally, she stated that she could hardly walk for exercise because it causes too much pain. (Tr. 89).

She sometimes uses a cane for support if she has to walk far. (Tr. 89). She spends her time attending church, watching television, listening to the radio, and reading. (Tr. 89).

-14-

Vandiver indicated her disability interfered with her ability to work because she was in pain. (Tr. 89). She indicated she sometimes suffers from unusual fatigue and requires naps or rest. (Tr. 90). She states she could only get out of bed for medical appointments, etc. (Tr. 90).

She described her pain by saying it felt like a knife in her low back, a sharp radiating pain in her hip and leg. (Tr. 90). She stated her pain interferes with her sleep and is located in her lower back, right hip and leg. (Tr. 90). She indicated she was in pain constantly. (Tr. 90).

Lifting, bending, sitting, standing, and walking all cause her to have pain. (Tr. 90). She indicated she cannot stand, walk, or sit, without pain. (Tr. 90). She stated trying to work on housework and rainy weather make her symptoms worse. (Tr. 90). She stated it sometimes helps the pain if she lays down with a pillow under her knees. (Tr. 90).

On an average day, Vandiver indicated she attempts to do housework but has to stop every ten minutes or so and lay back down. (Tr. 91). She stated she had mostly been staying in bed and trying not to injure her back any further. (Tr. 91).

In July, August and September of 1996, Vandiver was seen by Dr. Jerry O. Lenington at the Pain Clinic at the Holt-Krock Surgery Center. (Tr. 140-144). He did a series of three epidural steroid injections on her for questionable radicular pain at L4 and L5. (Tr. 140). After the second injection, Vandiver reported being 40% better. (Tr. 140). Following the third injection, Vandiver reported being back where she was with no benefit from the injections. (Tr. 140).

-15-

Dr. Lenington indicated she was not a surgical candidate. (Tr. 140). He indicated Vandiver needed to condition herself to take pain medications. (Tr. 140). However, he didn't believe she needed something like Lorcet Plus[2] which was what she was seeking. (Tr. 140).

On March 27, 1997, Vandiver was seen by Dr. Daniel. (Tr. 160). He noted she was not on Medicaid and was unable to get another MRI at the time and had been told she needed a hysterectomy by Dr. Atkins but was unable to get one because she didn't have the money. (Tr. 160). Dr. Daniel noted she had point tenderness over both sacroiliac junctions and had more pain in her back since she cared for her brother. (Tr. 160). Dr. Daniel injection both SI joints and noted that Vandiver had continued pain on the right side. (Tr. 160). He did not feel that Vandiver was abusing her medication. (Tr. 160).

On June 1, 1999, Dr. Daniel noted that there had been an increased amount of radicular component to Vandiver's pain. (Tr. 215). He prescribed Lorcet Plus to be taken every four hours as needed. (Tr. 215). After she saw the neurosurgeon and underwent an MRI, she was to return to see Dr. Daniel. (Tr. 215).

On August 5, 1999, Dr. Daniel reviewed the MRI with Vandiver and concluded the majority of her pain was due to the desiccation and bulge on the L4-5 disc on the lumbar spine. (Tr. 215). Dr. Daniel discontinued the Flexeril and Elavil prescribed by the neurosurgeon and prescribed Celebrex and continued her Lorcet plus. (Tr. 215).

---

[2]Lorcet Plus is a combination product containing Acetaminophen and Hydrocodone Bitartrate. *See Medline Plus, Drugs and Supplements*, www.nlm.nih.gov/medlineplus/druginfo.

-16-

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

-17-

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Vandiver contends the ALJ erred in a number of ways. First, she contends the ALJ failed to fully develop the record with respect to her pain in her right wrist that travels up her arm into her shoulder and neck. Vandiver contends the ALJ should have obtained a consultative examination to evaluate her wrist function. Moreover, she contends the ALJ failed to develop the record as to her history of treatment for depression, especially as it is associated with her chronic pain. Vandiver contends the ALJ should have obtained a consultative psychological evaluation.

The ALJ is required to fairly and fully develop the record even when the claimant has an attorney. *See e.g., Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000). However, the ALJ is required to order a consultative examination only when it is necessary for an informed decision. *Id.* In this case, the ALJ discussed and relied on records from Vandiver's treating physicians

-18-

regarding the impairments at issue. There was no unfair or prejudicial failure to develop the record. *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

With regard to Vandiver's depression, we note that before he reached his conclusions the ALJ summarized the medical evidence and Vandiver's testimony. While the ALJ does not specifically mention depression, it was not alleged as a basis of disability in her application and Vandiver did not mention it as a reason she could not return to work during her hearing testimony. (Tr. 46, 234). *See Gregg v. Barnhart*, 354 F.3d 710, 712-713 (8th Cir. 2003)(ALJ is not required to investigate claim not presented at time of benefits application and not offered at hearing as basis for disability). Similarly, there is little evidence of treatment for this condition. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)(ALJ is not required to discuss all evidence and failure to cite specific evidence does not mean it was not considered).

Second, Vandiver contends the ALJ improperly discredited her subjective complaints. Specifically, she contends he failed to consider all the objective medical evidence, improperly faulted her based on a perceived lack of treatment, did not mention her consistent limitations on her daily activities, and failed to acknowledge her medical doctor's have diagnosed her as suffering from pain.

In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

-19-

In this case, we believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d1320, 1322 (8th Cir. 1984) and conclude there is substantial evidence supporting the ALJ's determination that Vandiver's complaints were not fully credible. There is little in the way of medical evidence supporting her subjective complaints of pain. The ALJ also properly considered Vandiver's daily activities. While Vandiver reported very limited daily activities, she also reported to her doctor in July of 1996 that she re-injured her back after having been working in her garden for approximately thirty-five minutes. (Tr. 136).

The ALJ pointed out numerous inconsistencies in the record between the assessments of Vandiver's impairments and her description of her inability to work or perform daily activities. Inconsistencies between Vandiver's treatment records and her testimony were also considered. The "ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); *Black v. Apfel*, 143 F.3d 383, 388 (8th Cir. 1998)(upholding denial of benefits where no objective medical evidence supported claimant's subjective pain complaints).

The ALJ also properly considered Vandiver's infrequent treatment for her various impairments. *See e.g., Benskin v. Bowen,* 830 F.2d 878, 884 (8th Cir. 1987). Between August of 1994 and July of 1996, no treatment records exist. Although Vandiver testified she did not pursue further treatment because she did not have insurance and her finances were poor, there is no evidence that she attempted to obtain low-cost or free care. *See e.g., Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999).

-20-

Third, Vandiver argues the ALJ inaccurately determined her RFC. Vandiver points out the ALJ's RFC is based solely on the limitations noted by Dr. Cheyne in August of 1994. Based on the medical evidence in the record, Vandiver argues her RFC is actually far more limited. She states the radicular pain in her leg prevents her from being on her feet for up to six hours per day. Additionally, she states the RFC fails to take into account the impairment she has in her upper right extremity and her depression. When all factors are taken into consideration, Vandiver contends the only conclusion is that she cannot work.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id.* This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id.*

In the present case, the ALJ relied on Dr. Cheyne's statements regarding limitations on Vandiver's physical capabilities and employability, plaintiff's subjective complaints, and her

-21-

medical records. The ALJ set forth the limitations placed on Vandiver by Dr. Cheyne and reviewed the medical records of the other physicians who treated Vandiver.

The medical evidence does not support a finding of greater functional limitations than those found to exist by the ALJ. In fact, the medical findings are minimal and do not support any restrictions on Vandiver that would be inconsistent with this RFC.

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be affirmed.

Dated this 28th day of February 2006.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)